Estado Libre Asociado de Puerto Rico
**TRIBUNAL DE APELACIONES**
**PANEL VIII**

| | | |
|---|---|---|
| Manuel A. Collazo Collazo; Roberto Cotto Rivera; Armando Collazo Corsino; María Betzaida Martínez Rodriguez; Ramón Luis Calderón Rivera; Johana Matos Rodríguez; Fernando Matos García; Jennifer Semidey Ortiz; Licenia Rivera Ortiz; Wilfredo Torres Goycochea; Christian Luis Luna Guzmán; Carmen Inés León Rivera<br><br>Apelados<br><br>vs.<br><br>Comisión Estatal de Elecciones, representada por su Presidenta Alterna, Hon. Jessika Padilla; Aníbal Vega Borges, en su capacidad como Comisionado Electoral del Partido Nuevo Progresista; **Karla Angleró Gonzalez, en su capacidad oficial como Comisionada Electoral del Partido Popular Democrático**; Lillliam Aponte Dones, en su carácter oficial como Comisionada Electoral del Partido Movimiento Victoria Ciudadana; Roberto Aponte Berrios, en su capacidad oficial como Comisionado Electoral del Partido Independentista Puertorriqueño; Manuel M. Frontera Suau, en su capacidad oficial como Comisionado Electoral del Proyecto Dignidad<br><br>Apelante | KLAN202401096 | **APELACIÓN** procedente del Tribunal de Primera Instancia Sala Superior de San Juan<br><br><br><br>Civil Núm.: SJ2024CV10792<br><br><br><br><br><br>Sobre:<br><br>Art. 5.1 y 13.2 del Código Electoral de 2020; Sentencia Declaratoria, *Mandamus*, Solicitud de Interdicto Preliminar y Permanente |

Panel integrado por su presidente, el Juez Rivera Colón, el Juez Adames Soto y la Jueza Santiago Calderón.

Rivera Colón, Juez Ponente.

Número Identificador

SEN2024 _____

**SENTENCIA**
***NUNC PRO TUNC***[1]

En San Juan, Puerto Rico, a 11 de diciembre de 2024.

Comparece ante nos, la señora Karla Angleró Gonzalez, en su capacidad oficial como Comisionada Electoral del Partido Popular Democrático (en adelante, Comisionada del PPD o parte apelante), quien presenta recurso de apelación en el que solicita la revocación de la "Sentencia" emitida el 27 de noviembre de 2024,[2] por el Tribunal de Primera Instancia, Sala Superior de San Juan. Mediante dicho dictamen, el foro primario declaró Ha Lugar la solicitud de *mandamus* presentada contra la Comisión Estatal de Elecciones (CEE), y le ordenó a verificar, validar y adjudicar aquellos votos adelantados que cumplan con el requisito de identificación, independientemente de que éstos reflejen una dirección postal distinta a la consignada en el Registro General de Electores.

Examinada la solicitud de autos, la totalidad del expediente y el estado de derecho aplicable, confirmamos el dictamen apelado mediante los fundamentos que expondremos a continuación.

**I.**

El 21 de noviembre de 2024, el señor Manuel A. Collazo Collazo y otros 11 electores que solicitaron votar por el método de voto adelantado (en conjunto, Sr. Collazo Collazo *et al.* o parte apelada), presentaron una demanda sobre *mandamus*, sentencia declaratoria e *injunction* preliminar y permanente contra la CEE y los Comisionados Especiales de todos los partidos políticos. En síntesis, alegaron haber remitido el sobre conteniendo sus papeletas y copia de sus respectivas identificaciones a una dirección postal distinta a la que aparece en el Registro General de

---

[1] Se enmienda, *nunc pro tunc,* la Sentencia emitida el 11 de diciembre del 2024, a los únicos efectos de corregir en la página 24 de dicha Sentencia los apellidos de la Jueza Santiago Calderón, ya que por error involuntario se escribió "Jueza Calderón Santiago".
[2] Notificada en igual fecha.

Electores. Aducen que, debido a que sus votos contienen una dirección distinta al domicilio electoral del elector, la CEE determinó no contabilizarlos hasta tanto se pueda cotejar con el elector, a través del teléfono, que éste emitió y devolvió el voto. Arguyen que, al así actuar, la CEE se ha negado a contabilizar sus votos hasta tanto se cumpla con una condición adicional no establecida en ley. Por entender que cumplieron con todos los requisitos para el voto adelantado y que, por tanto, la CEE posee un deber ministerial de contabilizar y adjudicar los mismos, solicitaron un *mandamus* a esos efectos. Además, solicitaron una sentencia declaratoria a los fines de que la CEE no puede negarse a contabilizar estos votos, y un *injunction* preliminar y permanente para que la CEE cese y desista de exigir que la dirección colocada en la solicitud de voto adelantado sea igual a la que refleja su asiento electoral.

Posteriormente, el 25 de noviembre de 2024, compareció Lillliam Aponte Dones, en su carácter oficial como Comisionada Electoral del Partido Movimiento Victoria Ciudadana (en lo sucesivo, Comisionada Electoral del MVC). En resumidas cuentas, solicitó la desestimación de la reclamación bajo los siguientes argumentos: (1) los apelantes carecen de legitimación activa, ya que ninguno de ellos puede demostrar que sus votos no han sido adjudicados; (2) su solicitud es prematura porque el proceso de validación no ha culminado y ninguno de ellos puede tener certeza de si su voto será validado o no; (3) de resultar validada su identidad, el pleito se tornará académico; (4) la CEE posee amplia discreción para determinar los mecanismos de validación de identidad del elector, y sus determinaciones merecen deferencia; y (5) los remedios de *mandamus*, interdicto y sentencia declaratoria son improcedentes en derecho.

Ese mismo día, entiéndase, el 25 de noviembre de 2024, compareció la CEE representada por su Presidenta Alterna, la Hon. Jessika Padilla, y reconoció que las instrucciones de validación resultan en una traba adicional al elector y constituyen un riesgo en la adjudicación del voto adelantado. Particularmente, enfatizó el hecho de que, una vez evaluada y aprobada la solicitud de voto adelantado, el único proceso de validación de identidad es a través de la copia de la identificación del elector. De igual forma, admitió que el Código Electoral ni la reglamentación aplicable disponen un procedimiento de verificación adicional para aquellos votantes que reciben sus papeletas en una dirección distinta a la registrada. En cuanto a la procedencia de los remedios de *mandamus*, sentencia declaratoria e interdicto preliminar y permanente, la CEE sostuvo que existe otro remedio adecuado para atender la presente situación, específicamente, el Art. 5.1 del Código Electoral, *infra*.

Por otro lado, el señor Aníbal Vega Borges, en capacidad de Comisionado Electoral del Partido Nuevo Progresista (en adelante, Comisionado Electoral del PNP), compareció mediante escrito radicado el mismo 25 de noviembre de 2024. En esencia, esgrimió que cualquier requerimiento de verificación adicional, como lo es el comunicarse con el elector para verificar su identidad, constituye una infracción al procedimiento electoral estatuido y a los derechos constitucionales del elector. Adicionalmente, manifestó que tal requerimiento impone una carga que afecta de manera desigual a aquellos electores que optaron por ejercer su derecho a través del mecanismo del voto adelantado, restringiendo su acceso en iguales condiciones al proceso electoral. A su vez, añadió que la exigencia impuesta por la CEE es contraria a la Ley Núm. 165-2020, y que tampoco existe un interés apremiante por parte de la CEE que justifique la imposición de restricciones irrazonables. Por ende, apoyó la procedencia del *mandamus*, la sentencia declaratoria y el

interdicto preliminar y permanente, según solicitado por los apelados.

También, el 25 de noviembre de 2024, el señor Roberto Aponte Berrios, en su capacidad oficial como Comisionado Electoral del Partido Independentista Puertorriqueño, solicitó la desestimación de la "Demanda". Aseveró que la reclamación es prematura y que los apelados no poseen legitimación activa para presentarla. Apuntó que los votos serán contados y adjudicados en su momento, y que la CEE actuó conforme a derecho al adoptar un mecanismo para ratificar la información ofrecida por el elector. Indicó que la medida no le ha privado a los apelados de su derecho a ejercer el voto y que, por tratarse de una actuación razonable, dicha determinación merece deferencia.

Al día siguiente, el 26 de noviembre de 2024, la Comisionada del PPD solicitó la desestimación de la "Demanda". Esbozó que la reclamación se tornó académica porque: (1) los votos de ciertos apelados ya fueron validados, pero no hay manera de contactarlos porque no incluyeron sus teléfonos o direcciones de correo electrónico, y (2) las papeletas de los restantes apelados nunca fueron recibidas en la CEE y, por tanto, no había que contabilizarlas. Asimismo, hizo hincapié en que el mecanismo para validar la información es uno legítimo y que, lejos de lesionar los derechos de los votantes, protege la integridad del proceso electoral. Finalmente, realizó un listado de otras jurisdicciones en las que se han adoptado medidas de validación y, para intentar de demostrar fraude en el proceso, incluyó una tabla con 40 personas que colocaron la misma dirección postal en su solicitud de voto adelantado.

En igual fecha, entiéndase, el 26 de noviembre de 2024, el Comisionado del PNP replicó a los escritos presentados por los Comisionados del PPD, MVC y PIP. Destacó que: (1) por habérseles

condicionado su derecho al voto, los apelados tienen legitimación para revindicar el mismo y la controversia está madura; (2) la CEE merece deferencia siempre y cuando no actúe en contravención a la Constitución o la ley; (3) no se presentó evidencia de fraude, sino meras especulaciones; (4) el formulario del voto adelantado no provee para incluir el correo electrónico, y la ausencia del número telefónico es irrelevante; y (5) el pleito no es académico debido a que se trata de una cuestión recurrente o susceptible de volver a repetirse.

El Comisionado del PNP presentó otro escrito ese mismo 26 de noviembre de 2024, y peticionó que se le ordenara a la CEE a certificar el estatus sobre la validación y adjudicación de los votos adelantados, acorde la información que surge de los llamados "Informe de Pendientes".

Habiéndosele ordenado a la CEE proveer dicha certificación,[3] el 27 de noviembre de 2024, la agencia presentó una moción junto con la cual anejó una certificación de la cual surge que: (1) se recibieron y validaron las papeletas de cinco apelados, (2) se recibieron, pero están pendientes de validación, las papeletas de otros cinco apelados, y (3) no se recibieron las papeletas de uno de los apelados. Cabe resaltar que la CEE reiteró que, debido a que la aplicación de la condición de validación implica la privación de un derecho fundamental, ésta no merece deferencia. En cuanto al planteamiento de academicidad, estribó que, como la controversia es susceptible de volver a repetirse, el caso no debe desestimarse.

Atendidas las posturas de las partes, el 27 de noviembre de 2024,[4] el Tribunal de Primera Instancia emitió una "Sentencia" mediante la cual efectuó las siguientes determinaciones de hecho, las cuales hacemos formar parte íntegra del presente dictamen:

---

[3] Véase, apéndice págs. 340-342.
[4] Notificada ese mismo día.

*1. Según el Informe preliminar de casos pendientes de validación en el voto adelantado por correo en el área de cernimiento, preparado por la Junta Administrativa de Voto Ausente y Adelantado (JAVAA), al 23 de noviembre de 2024, quedaban un total de 7,130 votos adelantados pendientes de validación procesados en el marco de las Elecciones Generales y Plebiscito 2024.*

*2. El 20 de septiembre de 2024, luego de una reunión de Comisión, los cinco (5) partidos políticos, acordaron emitir unas Instrucciones a los oficiales JIP, JIT y JAVAA para la grabación de solicitudes de voto adelantado.*

*3. En dichas instrucciones se indicó, entre otras cosas, lo siguiente:*

*Cuando en la <u>Solicitud del Voto Adelantado</u> haya una dirección postal o residencial distinta a la registrada en el RGE, la JAVAA se comunicará con el elector, un mínimo de dos (2) intentos para validar su identidad. La Junta de Balance de Javaa deberá requerir que el elector le brinde sus datos; la Junta de Balance de Javaa no le brindará datos al elector.*

*a. Si la Junta de Balance de Javaa no pudiese contactar al elector, en el mínimo de intentos, para validar su identidad, procederá a grabar la <u>Solicitud de Voto Adelantado</u> y marcará el estatus: **pendiente de validación**.*

*b. Una vez validada la identidad del elector, se eliminará la marca de **pendiente de validación**.*

*4. Además, dichas instrucciones indican lo siguiente:*

*El sobre con papeletas del elector cuya identidad aún no ha podido ser validada, se organizará por precinto hasta que su identidad haya podido ser validada. La Junta de Balance de Javaa hará todos los intentos que sean necesarios para validar la identidad del elector hasta el último día del escrutinio. No se podrán abrir los sobres, ni adjudicar las papeletas de un elector cuya identidad no ha podido ser validada.*

Tras un análisis de los hechos que preceden y del derecho aplicable, el foro primario concluyó que: (1) los apelados poseen legitimación activa para presentar la "Demanda", al amparo del Art. 5.1 del Código Electoral, *infra*; (2) las instrucciones a los oficiales JIP, JIT y JAVAA interponen un requisito de validación adicional que no está contemplado en ley, y que fue implementado después de que los electores solicitaran y les fuera aprobado el voto adelantado; (3) para efectos del *mandamus*, los apelados

hicieron un requerimiento previo ante la CEE y, de todas maneras, en el presente caso no era necesario hacer tal requerimiento por reclamarse un deber de carácter público; (4) según la propia CEE, las instrucciones son contrarias al Art. 5.1 del Código Electoral, *infra,* y dicha determinación merece deferencia; (5) el alegado fraude no refleja a la realidad de Puerto Rico y corresponde al periodo anterior al envío de las papeletas; (6) acorde la certificación presentada por la CEE, el caso no se ha tornado académico, pues, todavía están pendiente de validación ciertas papeletas. Además, persisten miles de electores cuyos votos adelantados están pendientes de validación y, ante ello, la controversia es susceptible de volver a ocurrir; (7) la sentencia declaratoria no puede ser utilizada, toda vez que existe todo un andamiaje jurídico en el ámbito electoral que dispone la manera para verificar, validar y adjudicar el voto adelantado; y (8) tampoco procede el interdicto preliminar y permanente, ya que existe otro remedio adecuado en ley, en este caso, el *mandamus.*

En base a lo anterior, el foro apelado declaró Ha Lugar la solicitud de *mandamus* presentada por los apelados. De este modo, ordenó a la CEE a validar y adjudicar aquellos votos adelantados que cumplan con el criterio de identificación, independientemente de que éstos reflejen una dirección postal distinta a la consignada en el Registro General de Electores.

En desacuerdo con la determinación, la Comisionada del PPD recurre ante esta segunda instancia judicial, y señala la comisión del siguiente error, a saber:

> A. *Erró crasamente el Tribunal apelado al concluir que las instrucciones de validación imponen un requisito adicional no contemplado por el Código Electoral de 2020.*

## II.

### -A-

La Constitución de Puerto Rico garantiza el derecho fundamental al voto. Véase, Art. II, Sec. 2, Const. PR, LPRA, Tomo 1, ed. 2016, pág. 283. En específico, el texto constitucional sostiene que "[nuestras] leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral". *Íd.* El sufragio se considera una de las prerrogativas más importantes del Pueblo. *Pierluisi et al. v. C.E.E. et al.*, 204 DPR 841, 854 (2020).

Acorde las facultades concedidas en virtud del Art VI, Sección 6 de nuestra Carta Magna, la Asamblea Legislativa aprobó el Código Electoral de Puerto Rico de 2020, Ley Núm. 58-2020, 16 LPRA sec. 4501 *et seq.*, según enmendada. El precitado estatuto provee el marco legal que regula el proceso electoral en nuestro País y, en lo que nos concierne, reconoce el derecho que posee todo elector a que se le conceda la oportunidad del voto adelantado. Véase, Art. 5.1 del Código Electoral, 16 LPRA sec. 4561. Este método especial de votación tiene el objetivo de garantizar el ejercicio del derecho al voto a determinados electores, siempre y cuando sean elegibles para ello. Véase, Art. 2.3 del Código Electoral, 16 LPRA sec. 4503. Para que un elector pueda reclamar válidamente su derecho a ejercer el voto adelantado, éste deberá cumplir con los siguientes requisitos: (1) estar domiciliado en Puerto Rico, (2) estar activo en el Registro Electoral, y (3) afirmar bajo juramento que el día de la votación tendrá dificultades para asistir a su centro de votación por alguna de las razones dispuestas en ley. Véase, Art. 9.37 del Código Electoral, 16 LPRA sec. 4737.

Respecto a la solicitud del voto adelantado, el Art. 9.38 del

Código Electoral, 16 LPRA sec. 4738, provee lo siguiente:

*(1) La solicitud de Voto Adelantado se aceptará por la afirmación que en esta haga el Elector de su razón o categoría, con el alcance legal de un juramento y so pena de delito electoral si se demostrara que falseó su afirmación.*

*(2) Al momento de presentar su solicitud de Voto Adelantado, a ningún Elector se le podrá cuestionar, interrogar y tampoco requerir documentos o certificaciones de ningún tipo. A estos electores solo se les podrá cuestionar o requerir documentos cuando la Comisión o una parte interesada tenga y presente evidencia documental que confirme que la afirmación hecha por el Elector en su solicitud es falsa o incorrecta. Como evidencia documental que confirme más allá de duda razonable la inelegibilidad del Elector para votar adelantado, se aplicarán los mismos criterios de una recusación como si se estuviera realizando en un colegio de votación.*

[…]

*(7) En todo medio que se canalice la solicitud de Voto Adelantado, se incluirá la afirmación y el juramento siguiente del Elector solicitante:*

*"Juro (o Declaro) que presento esta solicitud de Voto Adelantado porque soy elector(a) inscrito(a) y activo(a) en el Registro General de Electores de Puerto Rico; soy domiciliado(a) en Puerto Rico; y cumplo con los requisitos de las categorías de electores que son elegibles para el Voto Adelantado en el próximo evento electoral. Que afirmo que toda la información que incluyo en mi solicitud de Voto Adelantado es cierta y correcta. Que estoy consciente que falsear esa información afirmada por mí de manera voluntaria en esta solicitud, podría representar la pérdida de mi oportunidad para votar, la no adjudicación de mi voto, o la imposición de penalidades bajo el Código Electoral de Puerto Rico de 2020."*

*(8)* **Para un Elector ser elegible para Voto Adelantado, deberá completar en su totalidad el formulario que provea la Comisión para ese propósito y todos los datos que esta le solicite para la corroboración de su identidad,** *incluyendo por medios electrónicos. Además de los datos personales y electorales del solicitante que requiera la Comisión, el Elector deberá proveer:*

*(a) los últimos cuatro dígitos de su Seguro Social personal;*
*(b) la* **dirección completa de su domicilio** *en Puerto Rico;*
*(c) la* **dirección postal completa del lugar donde recibiría por correo sus papeletas de**

*votación*, si ese fuese el método que seleccionó para su Voto Ausente;

(d) un número telefónico completo con código de área, si lo tuviera;

(e) un número de teléfono celular con código de área;

(f) el correo electrónico que utiliza con mayor frecuencia;

(g) un nombre de usuario (user name); y

(h) una clave secreta (password) con cuatro dígitos numéricos que nunca serán iguales a los últimos cuatro dígitos del Seguro Social personal del solicitante.

La Comisión determinará si el Elector deberá proveer contestaciones a preguntas de seguridad u otros elementos que considere necesarios para la corroboración de la identidad del Elector.

(Énfasis nuestro).

Por otro lado, el Art. 9.39 del Código Electoral, 16 LPRA sec. 4739, establece que:

*(1) **Todo Elector cuya solicitud de Voto Adelantado fue aprobada por la Comisión, deberá ejercer su voto conforme a los procedimientos que esta disponga por reglamento** para el voto en papeletas impresas en papel.*

[...]

*(3) Votos adelantados para emitirse en papeletas impresas y correo: **Este tipo de papeletas deberán ser enviadas al Elector a través del US Postal Service o transmitidas a su correo electrónico. En este caso, el Elector deberá devolver a la Comisión sus papeletas votadas** a través del US Postal Service, **con matasellos postal fechado no más tarde del día de la votación o Elección General.** Solamente se considerarán para contabilización aquellos votos adelantados válidamente emitidos que sean recibidos en la Comisión por correo, en o antes del último día del escrutinio general del evento electoral. **La validación de este tipo de Voto Adelantado también estará sujeta a que el Elector haya incluido la copia de su tarjeta de identificación electoral o cualquier otra identificación con foto y vigente** autorizada por esta Ley. Se prohíbe que se requiera la notarización o testigos para poder ejercer el derecho al voto a través de Voto Adelantado.*

(Énfasis suplido).

Para instrumentar el voto adelantado, la Comisión Estatal de Elecciones aprobó el "Reglamento de Voto Ausente y Voto Adelantado de Primarias 2024 y Elecciones Generales 2024" del 30

de agosto de 2024 (en adelante, Reglamento de Voto Adelantado). Los Títulos IV y V de este cuerpo reglamentario abarcan lo relacionado a la solicitud del voto adelantado y el ejercicio de tal derecho, respectivamente. En lo pertinente, la Sección 4.4 del Reglamento de Voto Adelantado contiene una lista de aquella información que el elector debe incluir en su solicitud, entre ésta, las siguientes direcciones: (1) la del domicilio, (2) la de su residencia, y (3) **la dirección postal donde recibirá la papeleta por correo**. Sobre la verificación de la identidad de esos electores que hayan solicitado voto adelantado por correo, la Sección 5.4 del Reglamento de Voto Adelantado dispone que:

> ***Según se reciban los sobres con las papeletas*** *conforme a los términos establecidos,* ***se procederá a verificar la identidad de cada elector que haya emitido su voto adelantado. Tal verificación se hará mediante el recibo de la copia de tarjeta de identificación electoral o cualquier otra identificación con foto y vigente*** *autorizada por el Código Electoral, o según determine la Comisión.*

(Énfasis provisto).

Por su parte, para suplir posibles procesos específicos, el 24 de septiembre de 2024, se aprobó el "Manual de Procedimiento para el Voto Adelantado por Correo para las Primarias de Ley y Elecciones Generales de 2024" (en lo sucesivo, Manual de Voto Adelantado). En lo atinente, la Sección 5.1 del Manual de Voto Adelantado incorpora las instrucciones que los electores deben seguir tras el recibo de las papeletas por correo postal. **No surge instrucción alguna en cuanto a que el elector tiene que confirmar su dirección de correo postal, en caso de que esta última sea distinta a la incluida en el registro electoral.**

Finalmente, la Sección 7.1 del Manual de Voto Adelantado especifica el procedimiento de verificación y validación. El proceso es el siguiente:

> *1. La Sub-Junta de Voto Ausente y Adelantado procederá a abrir el Sobre No. 2 (Correo) para verificar*

*que contenga la Tarjeta de Identificación del (de la) Elector(a).*

*2, La validación de esta categoría de Voto Adelantado estará sujeta a que el (la) Elector(a) haya incluido la copia de la tarjeta de identificación Electoral o identificación con foto y vigente, según definidas en el Código Electoral [...]*

*3. **La verificación se realizará mediante comparación de la foto en la copia de la identificación vigente del votante con la existente en eJavaa.***

*4. Luego de validar la identidad del (de la) Elector(a) y asegurarse que se trata de la misma persona, procederán a depositar el Sobre No. 2 (papeleta) en la urna correspondiente al Precinto.*

[...]

*7. **NO SE DEPOSITARÁN LOS SOBRES CON PAPELETAS EN LAS URNAS SIN HABER PASADO EL PROCESO DE VALIDACIÓN, ANTES DESCRITO.***

*8. Se prohíbe que se requiera la notarización o testigos para poder ejercer el derecho al voto a través de Voto Adelantado.*

(Énfasis nuestro).

**-B-**

Es norma reiterada en nuestro acervo jurídico que, "[c]uando la ley es clara y libre de toda ambigüedad, su texto no debe menospreciarse bajo el pretexto de cumplir su espíritu". Art. 19 del Código Civil de 2020, 31 LPRA sec. 5341. En ese sentido, "cuando el legislador se ha expresado en un lenguaje claro e inequívoco, el propio texto de la ley es la expresión por excelencia de la intención legislativa". *Pueblo v. Maldonado De Jesús y otro*, 212 DPR 872, 918 (2023), citando a *Cordero et al. v. ARPe et al.*, 187 DPR 445, 456 (2012).

De otra parte, la interpretación de un estatuto debe hacerse íntegramente, tomando en conjunto todas sus disposiciones, y no por secciones separadas. *Martajeva v. Ferre Morris y otros*, 210 DPR 612, 627 (2022). En otras palabras, "deben interpretarse las diferentes secciones, las unas en relación con las otras,

completando o supliendo lo que falte o sea oscuro en una con lo dispuesto en la otra, procurando siempre dar cumplimiento al propósito del legislador". *Rolón Martínez v. Supte. Policía*, 201 DPR 26, 40-41 (2018), citando a R.E. Bernier y J.A. Cuevas Segarra, Aprobación e Interpretación de las Leyes en Puerto Rico, 2.a ed. rev., San Juan, Pubs. JTS, 1987, pág. 315. En el cumplimiento de esta función, debemos armonizar, hasta donde sea posible, todas las disposiciones de ley, con el fin de lograr la interpretación más integrada, lógica y razonable de la intención legislativa.

**-C-**

El *mandamus* es un recurso discrecional y altamente privilegiado mediante el cual se le exige a una persona natural o jurídica el cumplimiento de un deber ministerial que esté dentro de las atribuciones o deberes del cargo que ocupa. Art. 649 del Código de Enjuiciamiento Civil, 32 LPRA sec. 3421. Un deber ministerial es aquel impuesto por ley y que la parte demandada tiene que cumplir; o sea, que no admite discreción en el ejercicio de su cumplimiento. *Kilómetro 0 v. Pesquera López et al.*, 207 DPR 200, 214 (2021). Es decir, "la ley no sólo debe autorizar, sino exigir la acción requerida". *AMPR v. Srio. Educación, E.L.A.*, 178 DPR 253, 264 (2010), citando a R. Hernández Colón, Derecho Procesal Civil, 4ta ed., San Juan, LexisNexis, 2007, pág. 477.

Por tanto, si el acto cuya ejecución se solicita depende de la discreción o el juicio del funcionario, el deber no puede considerarse como uno ministerial. *Romero, Valentín v. Cruz, CEE et al.*, 205 DPR 972, 985 (2020). Los deberes discrecionales, por no ser ministeriales, quedan fuera del ámbito del recurso de *mandamus*. *AMPR v. Srio. Educación, E.L.A.*, *supra*, a la pág. 264.

Es importante recalcar que, la determinación de si existe un deber ministerial "es una cuestión sujeta a interpretación judicial que no depende de un juicio *a priori* fundado exclusivamente en la

letra del estatuto". *Íd.* Sino que, esta determinación tiene que surgir del examen y análisis "de todos los elementos de juicio disponibles para así descubrir el verdadero significado y propósito de la disposición legal". *Íd.*, a la pág. 265.

No basta con una mera directriz o disposición legal que requiera al funcionario público hacer algo, sin más. *Íd.*, a la pág. 264. Resulta necesaria la existencia de un mandato específico que la parte demandada tiene que cumplir, sin que este último tenga la potestad de decidir si cumple o no el acto solicitado. *Íd.*

Por tratarse de un recurso extraordinario, el *mandamus* solo estará disponible cuando el peticionario demuestre que carece de "un recurso adecuado y eficaz en el curso ordinario de la ley". Art. 651 del Código de Enjuiciamiento Civil, 32 LPRA sec. 3423. A su vez, la parte peticionaria deberá demostrar que hizo un requerimiento previo, y que dicho requerimiento no fue debidamente atendido por el demandado. *Romero, Valentín v. Cruz, CEE et al., supra*, a la pág. 985.

Por su parte, al momento de considerar si procede o no conceder el *mandamus* solicitado, el tribunal deberá analizar, entre otros factores, los intereses públicos involucrados, y el impacto sobre la Rama Ejecutiva y los derechos de terceros. *Íd.*

Finalmente, debemos enfatizar que, el recurso de *mandamus*, tratándose un recurso extraordinario, solo procede en situaciones excepcionales y debe utilizarse con cautela. *AMPR v. Srio. Educación, E.L.A., supra*, a las págs. 295-296. En atención a ello, y como regla general, nuestra jurisprudencia ha reiterado la necesidad de que el demandado sea interpelado, como requisito para considerar una solicitud de *mandamus*. *Íd.*, a la pág. 296. Esta norma tiene excepciones como, por ejemplo, cuando se trata de un asunto de interés público, o casos que involucran asuntos de naturaleza electoral. *Íd.*

## III.

Según surge del tramite procesal discutido, todos los apelados solicitaron ejercer su derecho al voto adelantado y en sus solicitudes incluyeron, para recibir las papeletas, direcciones postales distintas a las que aparecen en el Registro de Electores. **Todas sus solicitudes fueron autorizadas por la CEE**. Ante este hecho, los apelados recibieron sus papeletas por correo, emitieron sus votos, y devolvieron el sobre acompañado de una copia de sus respectivas identificaciones, tal y como lo exige el Art. 9.39 del Código Electoral, *supra*.

Así las cosas, el 20 de septiembre de 2024, los Comisionados Electorales de los cinco partidos políticos acordaron emitir unas instrucciones indicando que, si en la solicitud de voto adelantado hay una dirección postal distinta a la registrada en JAVAA, será necesario comunicarse con el elector para que este último valide su identidad. Además, se dispuso que, cuando no sea posible validar su identidad, el voto quedará "pendiente de validación" y no será adjudicado hasta tanto la identidad del elector sea validada. **Los apelados no fueron advertidos sobre la imposición de esta condición al solicitar el voto adelantado**.

Estos hechos fueron los que motivaron la reclamación de epígrafe, y la "Sentencia" cuya revocación se nos solicita. Como ya adelantamos, el Tribunal de Primera Instancia concluyó que este requisito de validación de identidad no está contemplado en el Código Electoral, y que fue implementado después de que los electores solicitaran y les fuera aprobado el voto adelantado. Por lo anterior, ordenó a la CEE a verificar, validar y adjudicar aquellos votos adelantados que cumplan con el requisito de identificación (copia de tarjeta electoral o identificación con foto y vigente), independientemente de que estos reflejen una dirección postal distinta a la consignada en el Registro General de Electores.

En su recurso, la Comisionada del PPD alega que el foro *a quo* erró al determinar que las instrucciones de validación imponen un requisito adicional no contemplado por el Código Electoral. Fundamenta su postura en el Art. 9.38 del Código Electoral, *supra*, el cual dispone que, "[p]ara un Elector ser elegible para el Voto Adelantado, [dicho elector] deberá completar... todos los datos que [la CEE] le solicite para la corroboración de su identidad". Su contención es que, "[p]or definición, la frase de 'todos los datos que la [CEE] solicite para la corroboración de su identidad', implica que la tarjeta electoral u otro documento análogo no son los únicos mecanismos que el Código Electoral contempla para validar la identidad de un elector cuando se estime necesario".[5] Bajo esta premisa, reafirma que el requisito de validación en disputa es una herramienta legítima que la CEE puede utilizar para corroborar la identidad del elector. Adicionalmente, aduce que las instrucciones son una medida válida para prevenir el fraude electoral que presenta el mecanismo del voto adelantado.

En su alegato, la Comisionada Electoral del MVC se une a los argumentos de la apelante y los adopta por referencia. A su vez, añade que el Art. 9.38 del Código Electoral, *supra*, delega amplia discreción a la CEE para determinar los mecanismos que serán utilizados para identificar al elector que solicita el voto adelantado. En ese contexto, sostiene que el foro primario falló al no otorgarle deferencia al consenso alcanzado entre los cinco Comisionados Especiales. Por último, arguye que el requisito de validación no interfiere irrazonablemente con el ejercicio del derecho al voto de los apelados y que, como cuestión de derecho, la petición de *mandamus* era improcedente.

Por el contrario, los apelados y el Comisionado Electoral del PNP se oponen a la revocación de la "Sentencia" apelada. Insisten

---

[5] Véase, recurso a la pág. 9.

en que el requisito de validación en controversia no está contemplado en el Código Electoral, ni el Reglamento o el Manual de Voto Adelantado. En cambio, aseveran que el único proceso para validar la identidad del elector que ejerce su voto adelantado es a través de la copia de su tarjeta de identificación electoral o cualquier otra identificación con foto y vigente, según lo establece el Art. 9.39 del Código Electoral, *supra*.

Tras un detenido análisis del expediente apelativo ante nos, concluimos que el Tribunal de Primera Instancia actuó conforme a derecho. **El requisito de validación de identidad impugnado no está contemplado en la legislación electoral y su ejercicio transgrede los postulados más básicos del derecho al sufragio**. Por lo que, consecuentemente, actuó correctamente el foro apelado al ordenar a la CEE a verificar, validar y adjudicar aquellos votos adelantados que cumplan con el requisito de identificación dispuesto en el Art. 9.39 del Código Electoral, *supra*, independientemente de que éstos reflejen una dirección postal distinta a la consignada en el Registro General de Electores.

Cónsono con el derecho discutido, para que un elector pueda ejercer su derecho al voto adelantado éste tiene que ser elegible. Precisamente, por este motivo es que el elector tiene que solicitarlo. De este modo, el inciso (8) del Art. 9.38 del Código Electoral, *supra*, exige que, para que un elector sea elegible para el voto adelantado, este debe: (1) completar el formulario o la solicitud que provee la CEE para esos efectos, en su totalidad; y (2) proveer cierta información básica con el propósito de facilitar la corrobación de su identidad. Esta información es provista por el elector al momento en que éste **solicita** el voto adelantado, con el fin de determinar si es elegible o no.

A esos fines, el elector tiene que proveer "todos los datos que [la CEE] le solicite para la corroboración de su identidad". Además

de los datos requeridos por la CEE, el elector deberá incluir la siguiente información:

> *(a) los últimos cuatro dígitos de su Seguro Social personal;*
> *(b) la **dirección completa de su domicilio** en Puerto Rico;*
> *(c) la **dirección postal completa del lugar donde recibiría por correo sus papeletas de votación**, si ese fuese el método que seleccionó para su Voto Ausente;*
> *(d) un número telefónico completo [...]*
> *(e) un número de teléfono celular [...]*
> *(f) el correo electrónico que utiliza con mayor frecuencia;*
> *(g) un nombre de usuario (user name); y*
> *(h) una clave secreta (password) [...]*

(Énfasis suplido).

**Como puede apreciarse, el Art. 9.38 del Código Electoral,** *supra*, **faculta a la CEE para solicitar al elector aquellos datos que estime necesarios para corroborar su identidad <u>al momento en que el elector solicita el voto adelantado</u>.**

Habiéndose aprobado la solicitud del elector, entonces éste queda facultado para ejercer su voto conforme los procedimientos dispuestos para ello. Ejercido el voto, el elector deberá devolver a la CEE sus papeletas votadas a través del correo postal, **e incluir una copia de su tarjeta de identificación electoral o cualquier otra identificación con foto y vigente**. Véase, Art. 9.39 del Código Electoral, *supra*. La inclusión de una copia de la tarjeta electoral o de una identificación con foto responde a la necesidad de validar y corroborar la identidad de ese elector. Así lo reconoce la Sección 5.4 del Reglamento de Voto Adelantado, la cual dispone que, **una vez se reciban los sobres con las papeletas, se procederá a verificar la identidad del elector a través de la copia de su tarjeta de identificación**. Asimismo, la Sección 7.1 del Manual de Voto Adelantado especifica, paso a paso, el proceso para validar la identidad del elector y asegurarse que se trata de la misma persona. Como paso inaugural, se verificará que, en efecto, el elector haya incluido copia de la tarjeta electoral o identificación

con foto y vigente. Luego, "[l]a verificación se realizará mediante comparación de la foto en la copia de la identificación vigente del votante con la existente en Javaa". *Íd*. Validada la identidad del elector, se procederá a depositar el sobre conteniendo sus papeletas en la urna correspondiente al Precinto. *Íd*.

**De las disposiciones que anteceden se desprende que la CEE verificará la identidad del elector que solicita el voto adelantado en dos momentos distintos: (1) primero, cuando el elector <u>solicita</u> el voto adelantado, al amparo del Art. 9.38 del Código Electoral, *supra*; y (2) segundo, <u>luego de aprobada la solicitud y después que el elector emite su voto</u>, se verificará la identidad del elector a través de la copia de su tarjeta electoral o identificación con foto y vigente, según el Art. 9.39 del Código Electoral, *supra*, la Sección 5.4 del Reglamento de Voto Adelantado, y la Sección 7.1 del Manual de Voto Adelantado.**

En el presente caso, la CEE se ha negado a validar y adjudicar los votos adelantados emitidos por los apelados bajo el pretexto de que, en sus solicitudes, estos incluyeron una dirección postal distinta a la consignada en el Registro General de Electores. En esta etapa, o sea, **después de que los electores solicitaran y <u>les fuera aprobado el voto adelantado</u>, el requisito legal de verificación de la identidad se satisface mediante la copia de la tarjeta de identificación, según lo dispone el Art. 9.39 del Código Electoral, *supra*.**

No tan solo eso, sino que, tanto el Art. 9.38 del Código Electoral, *supra*, así como la Sección 4.4 del Reglamento de Voto Adelantado permiten que el elector incluya en su solicitud de voto adelantado: (1) **la dirección del domicilio** y (2) **la dirección postal donde recibirá la papeleta por correo**. De esta forma, el propio ordenamiento legal permite que, en sus solicitudes de voto

adelantado, los electores incluyan direcciones postales distintas a las que aparecen en el Registro de Electores para recibir las papeletas.[6] **No tiene sentido que la propia ley permita al elector incluir una dirección postal distinta a la registrada en JAVAA y que, posteriormente, la CEE se niegue a adjudicar su voto adelantado por esta razón**

Tampoco podemos pasar por desapercibido que **los apelados no fueron advertidos sobre la imposición de esta condición al solicitar el voto adelantado**, puesto que de la Sección 5.1 del Manual de Voto Adelantado no surge instrucción alguna en cuanto a que el elector tiene que confirmar su dirección de correo postal, en caso de que esta última sea distinta a la incluida en el registro electoral.

Además, resulta preciso puntualizar que la validación de la identidad del elector a través de la copia de su tarjeta electoral o identificación con foto y vigente posee suficientes garantías de confiabilidad. No nos convence la postura de la Comisionada del MVC en cuanto a que "la validación de la identidad no pude descansar únicamente en el recibo de la copia de la identificación del deudor".[7] El hecho de que el elector que ejerce su voto adelantado no esté físicamente presente no impide que se pueda corroborar que su rostro es el mismo que aparece en su identificación. Es por eso que se valida su identidad comparando la foto que aparece en la copia de la identificación del votante junto con la existente en eJavaa.

Tampoco estamos de acuerdo con que la petición de *mandamus* presentada por los apelados es improcedente. No está en disputa que la CEE posee un deber ministerial impuesto por ley

---

[6] Abona a nuestro análisis el hecho de que el Art. 5.8 de la Ley Núm. 165-2020, la cual también garantiza el derecho al voto adelantado, provee que "[s]iempre se enviará al elector a través del correo regular a la dirección que éste indicó en su solicitud de Voto Adelantado"

[7] Véase, "Alegato en Apoyo a Recurso de Apelación" a la pág. 7.

de contar y adjudicar el voto conforme a la intención del elector. Véase, Art. 5.1 del Código Electoral, *supra*. Es esta agencia quien posee la función y el deber de "[c]umplir y hacer cumplir las disposiciones y los propósitos del [Código Electoral]". Art. 3.2 de la Ley Núm. 165-2020, 16 LPRA sec. 4512. Por ende, le corresponde validar la identidad de los electores acorde la ley y los reglamentos aplicables. Aun cuando la Comisionada del MVC persiste en que los apelados no interpelaron a la CEE, lo cierto es que esta norma no es absoluta. **Se puede prescindir de este requerimiento cuando se trata de un asunto de interés público, o en casos que involucran asuntos de naturaleza electoral**. *AMPR v. Srio. Educación, E.L.A., supra*, a la pág. 296.

Por las razones que anteceden, concluimos que **el único proceso para validar la identidad del elector que ejerce su voto adelantado es a través de la copia de su tarjeta de identificación electoral o cualquier otra identificación con foto y vigente**. La CEE deberá verificar, validar y adjudicar aquellos votos adelantados que cumplan con el requisito de identificación que establece el Art. 9.39 del Código Electoral, *supra*, la Sección 5.4 del Reglamento de Voto Adelantado, y la Sección 7.1 del Manual de Voto Adelantado.

Queremos aclarar que, al interpretar la ley, debemos armonizar, en la medida que sea posible, todas las disposiciones del estatuto con el fin de lograr la interpretación más integrada, lógica y razonable de la intención legislativa. No albergamos duda de que la interpretación que hoy hacemos sobre el Código Electoral, en conjunto con el Reglamento y el Manual de Voto Adelantado, es la que mejor cumple el propósito del legislador.

**En Puerto Rico, el derecho al voto constituye un pilar fundamental de nuestra democracia, y nuestra legislación electoral está diseñada con el propósito de garantizar la plena**

participación ciudadana en los procesos electorales. Para honrar y proteger esta tradición democrática, es imperativo que los Comisionados trasciendan las agendas particulares que pudieran obstaculizar su desempeño, y enfoquen sus esfuerzos en servir de manera íntegra al Pueblo de Puerto Rico. Ciertas actuaciones por parte de los representantes de los distintos partidos políticos ante la CEE pueden interpretarse como un intento de dilatar el proceso de recuento de las papeletas emitidas en las pasadas elecciones, con el fin de otorgarle supremacía a los Partidos sobre la voluntad expresada libre y democráticamente por el Pueblo mediante el voto. El voto de los electores, así como la decisión de la mayoría, deben prevalecer sobre cualquier interés partidista. Los representantes de los Partidos no pueden ir en contra del postulado más básico de nuestra democracia, y lo contrario pone en peligro el fundamento mismo de nuestro sistema democrático.

La Presidenta de la CEE tiene la responsabilidad de asumir un liderato firme y decidido, que esté libre de cualquier influencia o coacción por parte de los partidos políticos. Solo así se podrá completar el recuento de las papeletas y certificar todos los candidatos electos sin mayor dilación.

El no contar los alegados votos equivaldría a un intento de golpe de Estado a la democracia, la voluntad del Pueblo y de los votantes.

Puerto Rico no espera menos de la CEE y sus componentes.

## IV.

Por los fundamentos expuestos, los que hacemos formar parte de este dictamen, confirmamos la "Sentencia" apelada

emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan.

**Notifíquese inmediatamente.**

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones. La Jueza Santiago Calderón emite voto escrito de conformidad. El Juez Adames Soto disiente con voto escrito.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

Estado Libre Asociado de Puerto Rico
**TRIBUNAL DE APELACIONES**
**PANEL VIII**

| | | |
|---|---|---|
| Manuel A. Collazo Collazo; Roberto Cotto Rivera; Armando Collazo Corsino; María Betzaida Martínez Rodriguez; Ramón Luis Calderón Rivera; Johana Matos Rodríguez; Fernando Matos García; Jennifer Semidey Ortiz; Licenia Rivera Ortiz; Wilfredo Torres Goycochea; Christian Luis Luna Guzmán; Carmen Inés León Rivera <br><br> Apelados <br><br> vs. <br><br> Comisión Estatal de Elecciones, representada por su Presidenta Alterna, Hon. Jessika Padilla; Aníbal Vega Borges, en su capacidad como Comisionado Electoral del Partido Nuevo Progresista; **Karla Angleró Gonzalez, en su capacidad oficial como Comisionada Electoral del Partido Popular Democrático**; Lillliam Aponte Dones, en su carácter oficial como Comisionada Electoral del Partido Movimiento Victoria Ciudadana; Roberto Aponte Berrios, en su capacidad oficial como Comisionado Electoral del Partido Independentista Puertorriqueño; Manuel M. Frontera Suau, en su capacidad oficial como Comisionado Electoral del Proyecto Dignidad <br><br> Apelante | KLAN202401096 | **APELACIÓN** procedente del Tribunal de Primera Instancia Sala Superior de San Juan <br><br><br> Civil Núm.: SJ2024CV10792 <br><br><br><br> Sobre: <br><br> Art. 5.1 y 13.2 del Código Electoral de 2020; Sentencia Declaratoria, *Mandamus*, Solicitud de Interdicto Preliminar y Permanente |

Panel integrado por su presidente, el Juez Rivera Colón, el Juez Adames Soto y la Jueza Santiago Calderón

**VOTO DE CONFORMIDAD DE LA JUEZA SANTIAGO CALDERÓN**

En San Juan, Puerto Rico, a 11 de diciembre de 2024.

Estoy conforme con la sentencia que se emite hoy porque, al tomar en consideración las particularidades de este caso, concluyo ser apropiado cumplir con nuestra responsabilidad de defender los derechos constitucionales de nuestros ciudadanos frente a la instrucción sobre el voto adelantado emitida por la CEE, aun con la aprobación y acuerdo de los Comisionados y Comisionadas Electorales.

El Artículo II, Sección 2 de la Constitución de Puerto Rico reza de la siguiente manera: "Las leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral"[8]. Ciertamente, una instrucción de la CEE no debe rebasar ni lacerar los derechos fundamentales reconocidos en nuestra Constitución.

Así, a pesar de ser norma establecida el que nuestra función revisora debe conceder una gran deferencia a las determinaciones emitidas por la CEE —en este caso, la instrucción sobre el voto adelantado— en virtud de la vasta experiencia y conocimiento especializado en los asuntos que les han sido encomendados, nuestra deferencia a la CEE cede cuando la implementación de la instrucción desemboca en unos resultados que no son compatibles con la Constitución ni con los derechos fundamentales de los electores quienes ejercieron su derecho mediante el voto adelantado.

En el caso de autos y como se detalla en nuestra Sentencia no existe controversia sobre los hechos materiales. De tal manera, solo tenemos que decretar si incide en nuestro ordenamiento jurídico la instrucción que emitió la CEE el 20 de septiembre de 2024, la cual determinó no contabilizar los votos adelantados dirigidos a direcciones postales distintas a la del domicilio del

---

[8] Art. II, Sec. 2, Const. ELA [Const.PR], LPRA, Tomo I.

elector hasta tanto se pudiera cotejar con el elector por teléfono que emitió y devolvió el voto. No cabe duda de que esta instrucción fue emitida con posterioridad al término establecido por el Código Electoral 2020 para solicitar el voto adelantado. Nótese que la directriz es una interna para los oficiales de la JIP, JIT y JAAVA para así imponer nuevos mecanismos de validación de identidad del elector, los cuales no están contemplados en el Código Electoral 2020, ni públicamente notificados para así empoderar a los electores del proceso y evitar la consecuencia de inhabilitar votos.

En realidad, la instrucción de la CEE y la forma en que se desea implementar perjudica los derechos de los electores que ejercieron su derecho al voto por medio del mecanismo de voto adelantado.

Cónsono con lo anterior, al justipreciar todas las alegaciones de las partes y examinar concienzudamente la Sentencia emitida por el foro primario, no puedo validar la solicitud de la parte apelante. A la luz de lo anterior, la instrucción sobre el nuevo método de validación de la identificación del elector rebasa el límite que el propio Código Electoral 2020 concedió a la CEE y lacera los derechos de los electores de ejercer el voto de la forma que establece el Artículo II, Sección 2 de la Constitución de Puerto Rico.

Ante ello, no tengo reserva alguna de que la Sentencia que emite nuestro foro intermedio es justa y adecuada en derecho. Por todo lo cual, razono que procede la confirmación de la decisión apelada.

Grisel M. Santiago Calderón
Jueza del Tribunal de Apelaciones

Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
Panel VIII

| | | |
|---|---|---|
| MANUEL A. COLLAZO COLLAZO; ROBERTO COTTO RIVERA; ARMANDO COLLAZO CORSINO; MARÍA BETZAIDA MARTÍNEZ RODRÍGUEZ; RAMÓN LUIS CALDERÓN RIVERA; JOHANA MATOS RODRÍGUEZ; FERNANDO MATOS GARCÍA; JENNIFER SEMIDEY ORTIZ; LICENCIA RIVERA ORTIZ; WILFREDO TORRES GOYCOCHEA; CHRISTIAN LUIS LUNA GUZMÁN; CARMEN INÉS LEÓN RIVERA<br><br>Apelados<br><br>v.<br><br>COMISIÓN ESTATAL DE ELECCIONES Y OTROS<br><br><br>KARLA ANGLERÓ GONZÁLEZ<br>Apelante | KLAN202401096 | *Apelación* procedente del Tribunal de Primera Instancia, Sala de San Juan<br><br>Caso Núm. SJ2024CV10792<br><br>Sobre:<br>Demanda bajo los Artículos 5.1 y 13.2 de la ley Núm. 58 de 2020, Sentencia Declaratoria, *Mandamus*, Solicitud de Interdicto Preliminar y Permanente |

Panel integrado por su presidente, el Juez Rivera Colón, el Juez Adames Soto y la Jueza Santiago Calderón

## VOTO DISIDENTE DEL HONORABLE NERY E. ADAMES SOTO

I.

Una vez más[9] se le solicita al Poder Judicial, esta vez a través de este Tribunal de Apelaciones, su intervención en una polémica surgida durante el proceso electoral, que refiere al voto adelantado en este caso. A mi juicio, dilucidar de manera cabal la controversia ante nuestra consideración requería un esfuerzo por armonizar dos altísimos principios dirigentes del sistema democrático: (1) el derecho constitucional al voto de nuestros ciudadanos, y que este acontezca libre de toda coacción

---

[9] Véase *Gautier Vega v. CEE*, 205 DPR 724, (2020), y la *Sentencia* emitida en *Com. PNP v. CEE II*, 196 DPR 706 (2016).

institucional en su ejercicio; (2) el también derecho constitucional de la ciudadanía a que se garantice la pureza del proceso eleccionario, mediante la provisión de mecanismos que eviten la posibilidad de fraude electoral. Juzgo que falta por comprender que tales derechos están íntimamente relacionados, pues no puede concretizarse el derecho al voto, allí donde reine la desconfianza sobre el proceso donde acontece. Es decir, liviano resultará resaltar con mil adjetivos la importancia del *derecho al voto*, (toda, sin duda), cuando no se proveen garantías de confiabilidad en su ejercicio.

Junto a estos temas enumerados se unen consideraciones sobre los límites a nuestra labor revisora respecto a las determinaciones administrativas sobrevenidas del órgano al que el Legislador expresamente reconoció pericia sobre el tema electoral, la Comisión Estatal de Elecciones (CEE). Veamos.

II.

El 20 de septiembre de 2024, **la CEE aprobó por unanimidad de sus cinco Comisionados Electorales**[10], las *Instrucciones a los oficiales JIP. JIT, y JAVAA para la grabación de solicitudes de voto adelantado*, (*Instrucciones*, en adelante), que fue suscrita, a su vez, por la Presidenta Alterna. A tenor con dicho acuerdo unánime de los Comisionados Electores, se impartieron las siguientes directrices al personal de la CEE a cargo de velar por el proceso de voto adelantado:

1. Al grabar una Solicitud de Voto Adelantado, el oficial de inscripción validará la información del elector, a través de sus datos personales, dirección residencial y postal cumplimentadas en la solicitud, contra el Registro General de Electores (RGE).

---

[10] Este solo hecho debería servir para dar al traste con la continua afirmación de los demandantes de que el proceso de verificación de identidad de los electores por voto adelantado responde a un *intento de los partidos minoritarios* por interferir con el derecho al voto. Las *Instrucciones* no fueron aprobadas por los partidos minoritarios, sino por la totalidad de los Comisionados Electorales.

2. Si la dirección postal que colocara el elector en la Solicitud del Voto Adelantado para recibir sus papeletas, por correo, o la dirección residencial que colocara el elector para ruta domicilio, es la misma del RGE, el oficial de inscripción procederá a grabar la Solicitud del Voto Adelantado. Si se desprendiese que la dirección tiene un error gramatical, o numérico, el oficial procederá a corregir los datos, conforme las instrucciones ya dadas.

3. Si la dirección postal que colocara el elector en la Solicitud del Voto Adelantado para recibir sus papeletas, por correo, o la dirección residencial que colocara el elector para la ruta domicilio, son **distintas, o no coinciden**, a la del RGE, el oficial de inscripción procederá a grabar la dirección postal, o residencial en los campos de dirección postal de la solicitud de JAVAA provisto por el sistema, a la cual le llegarán las papeletas por correo postal, o la ruta del voto domicilio. (Véase captura de pantalla de la JIP/JIT).

### *Procedimiento exclusivo en la JAVAA*:

1. Cuando en la Solicitud del Voto Adelantado haya una dirección postal o residencial distinta a la registrada en el RGE, la JAVAA se comunicará con el elector, un mínimo de dos (2) intentos para validar su identidad. La Junta de Balance de Javaa deberá requerir que el elector le brinde sus datos; la Junta de Balance de Javaa no le brindará los datos al elector.

   a. Si la Junta de Balance de Javaa no pudiese contactar al elector, en el mínimo de intentos, para validar su identidad, procederá a grabar la Solicitud de Voto Adelantado y marcará el estatus: **pendiente de validación**.

   b. Una vez validada la identidad del elector, se eliminará la marca de pendiente de validación de la solicitud del elector.

2. La Junta de Balance de Javaa preparará el sobre con sus correspondientes papeletas con la dirección postal, o la dirección física para la ruta de domicilio, dependiendo la categoría escogida por el elector, según los campos de dirección colocados **por el elector en la solicitud de JAVAA**. Con o sin la validación del elector, se enviarán las papeletas según la modalidad seleccionada por el elector, asegurándose de mantener el estatus de pendiente de validar en aquellas solicitudes correspondientes a electores cuya identidad no ha sido validada.

3. Cuando el sobre con las papeletas votadas regrese a la JAVAA, será escaneado por la Junta de Balance de Javaa para registrar su recibo. Si este sobre correspondiese a un elector cuya identidad aún está pendiente de validación, el sistema alertará a la Junta de Balance de Javaa que aún está pendiente de validar.

4. El sobre con papeletas del elector cuya identidad aún no ha podido ser validada, se organizará por precinto hasta que su identidad haya podido ser validada. La Junta de Balance de Javaa hará todos los intentos que sean necesarios para validar la identidad del elector hasta el

> último día del escrutinio. **No se podrán abrir los sobres, ni adjudicar las papeletas de un elector cuya identidad no ha podido ser validada.** (Véase captura de pantalla de Javaa).

(Énfasis y subrayado en el original).

No obstante, el 21 de noviembre de 2024, varios electores que ejercieron el derecho al voto mediante el voto adelantado impugnaron dichas *Instrucciones*, mediante la presentación de una *Demanda* ante el Tribunal de Primera Instancia, (TPI). Adujeron, en apretadísima síntesis, que a través de las *Instrucciones* la CEE había impuesto unas cortapisas al voto adelantado, no sustentadas por fuente legal alguna. En específico, adujeron que la CEE determinó no contabilizar los votos adelantados dirigidos a direcciones distintas a las del domicilio del elector, hasta tanto se pudiera cotejar con el elector por teléfono que este emitió y devolvió el voto. Aseveraron que, como consecuencia de tal directriz, se le había coartado su derecho a la adjudicación de los votos adelantados ya emitidos, a pesar de haber cumplido con los requerimientos que la Ley Electoral, infra, disponía para su ejercicio efectivo. En consecuencia, solicitaron como remedio al foro primario, en lo pertinente, que ordenara a la CEE contabilizar sus votos.

En respuesta, los cinco Comisionados Electorales comparecieron ante el foro *a quo* mediante sus respectivos escritos. De estos, esgrimieron fundamentos en oposición a lo solicitado en la *Demanda* el Partido Popular Democrático, (PPD), el Partido Independentista Puertorriqueño (PIP), y el Movimiento Victoria Ciudadana (MVC). Ciñéndome solo a lo pertinente al señalamiento de error ante nuestra atención, en sus escritos los Comisionados del PPD, PIP y MVC coincidieron en resaltar, entre otros: la deferencia judicial que debía el TPI a la interpretación que la CEE dio a la Ley Electoral, infra, al aprobar las *Instrucciones*; que tales

directrices ubicaban dentro de los poderes que la legislación electoral le reconocía a la CEE, para cuya aprobación contaron con la unanimidad de los Comisionados Electorales; con dicho proceder la CEE estableció salvaguardas para velar por la pulcritud del proceso de votación mediante el voto adelantado, evitando el fraude. Con relación a la justificación de aprobar las *Instrucciones* como un mecanismo para evitar un posible fraude a través del voto por adelantado, en la comparecencia del PPD se incluyeron unas tablas donde surgía que, a una alta cantidad de votantes, (40), se les envió a la misma dirección los sobres que contenían las boletas de votación, lo que debía causar suspicacia.

Por otra parte, a favor de los planteamientos esgrimidos por los demandantes se colocó el Comisionado Electoral del Partido Nuevo Progresista (PNP), acogiendo por entero la argumentación de estos[11]. Al así posicionarse, el Comisionado del PNP no ofreció o incluyó explicación alguna sobre el completo cambio de postura con referencia al voto que había concedido para la aprobación de las *Instrucciones* y constituía su posición oficial en la CEE.

La CEE también compareció ante el foro *a quo*, a través de su Presidenta Alterna, Hon. Jessika Padilla Rivera, mediante *Moción aclarando exposiciones de partes y cumpliendo con orden sobre certificación*[12]. Inició su argumentación haciendo dos aseveraciones que resultan de peso para la controversia que nos correspondió dirimir y merecen ser destacadas: (1) que la doctrina sobre la deferencia judicial a las determinaciones de la CEE fue específicamente establecida en el Art. 13.1(2) de la Ley Electoral, infra; (2) **que tal deferencia aplica a la determinación inicial de la CEE al aprobar las *Instrucciones*, cuyo propósito fue el de**

---

[11] Apéndice V del recurso de apelación, págs. 123-151
[12] Apéndice XIII del *recurso de apelación*, págs. 344-349.

buscar *mayor pureza del proceso*[13]. (Énfasis provisto). Establecido esto, también arguyó sobre una disyuntiva que, a su juicio, variaba tal determinación (las contenidas en las *Instrucciones*), que las verificaciones de la identidad de los votantes por voto adelantado que solicitaron el envío de dicho voto a direcciones distintas a las de su registro electoral, había causado dilaciones en la práctica que lesionaban el ejercicio de dicho derecho fundamental.

Entonces, habiéndose planteado por uno de los demandados que las reclamaciones de los demandantes advinieron académicas, por cuanto, presuntamente, ya había sido validada la identidad de un buen número de estos, el TPI ordenó a la CEE proveer certificación sobre ello. De conformidad, **la CEE certificó que habían sido validadas las identificaciones de cinco (5) de los demandantes, cuyos nombres se incluyeron, y restaban cinco (5) votantes de estos por validar, cuyos nombres también fueron provistos**[14].

Luego del TPI considerar las distintas mociones instadas por las partes, pero sin ordenar la celebración de una vista evidenciaria, el 27 de noviembre de 2024, emitió la *Sentencia* cuya revocación se nos solicita, declarando *Ha Lugar* el *mandamus* instado por los demandantes. En consecuencia, la CEE ordenó *contabilizar **absolutamente todos los votos adelantados** que cumplan con el requisito de identificación, **sin excepción y sin crear barrera o condiciones procesales onerosas al lector**[15]*. (Énfasis provisto). Es decir, para todos los efectos prácticos, el TPI dejó sin efecto o anuló las *Instrucciones* emitidas por la CEE.

En desacuerdo, la Comisionada del PPD acudió ante nosotros mediante *recurso de apelación*. A partir de lo cual,

---

[13] *Íd.*, pág. 344.
[14] Apéndice XIII del *recurso de apelación*, págs. 347 y 348.
[15] Apéndice XV del *recurso de apelación*, pág. 381.

posteriormente comparecieron también la Comisionada del MVC, el Comisionado del PNP y los propios demandantes, aquí apelados, elaborando sobre los argumentos que ya habían adelantado al foro primario.

### III.

La democracia representativa es la piedra angular de nuestra vida colectiva como pueblo, así lo recoge diáfanamente el Preámbulo de la Constitución del Estado Libre Asociado de Puerto Rico (Const. ELA), al enfatizar el carácter democrático de nuestra sociedad, donde el orden político emana del Pueblo y se ejerce con arreglo a la voluntad manifiesta en las urnas. *McClintok v. Rivera Shatz,* 171 DPR 584 (2007). De aquí que el voto de la ciudadanía es base fundamental del sistema democrático, principio que quedó plasmado en la Const. ELA al establecer que "[l]as leyes garantizarán la expresión de la voluntad del pueblo mediante el *sufragio universal, igual, directo y secreto,* y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral". Art. II, Sec. 2, Const. PR, LPRA, Tomo 1, ed. 2016, pág. 283. Por ello nuestro Tribunal Supremo ha reiterado que el derecho al voto constituye una garantía fundamental. *Gautier Vega v. CEE,* 205 DPR 724 (2020); *P.I.P. v. C.E.E.,* 120 DPR 580, 615 (1988); *Ortiz Angleró v. Barreto Pérez,* 110 DPR 84, 88 (1980).

Sin embargo, el mismo alto Foro ha advertido que, aunque resulta indudable que el derecho a votar es de carácter fundamental, *no constituye un derecho absoluto. PNP v. De Castro Font II,* 172 DPR 883, 894 (2007). De lo que se deriva que la propia Constitución ELA circunscribiera tal principio al mandato legislativo, al ordenar, en lo pertinente, que la Asamblea

Legislativa, *dispondrá por ley todo lo concerniente al proceso electoral y de inscripción de electores, así como lo relativo a los partidos políticos y candidaturas.* Art. VI, Sec. 4 Const. ELA. Por tal razón, nuestro Foro de última instancia ha reiterado que la Const ELA delegó en la Asamblea Legislativa la función de regular el derecho al voto, así como los procesos electorales, derivando del Art. VI, Sec. 4 *un margen de autoridad amplio y abarcador para legislar en asuntos de materia electoral,* incluyendo los requisitos para ejercer el derecho al voto en nuestra jurisdicción. *Gautier Vega v. CEE,* supra; *Pierluisi et al. v. CEE,* 204 DPR 841 (2020); *McClintok v. Rivera Shatz,* supra; *PNP v. Tribunal Electoral,* 104 DPR 741 (1976).

Por supuesto, la cláusula constitucional dirigida a garantizar el derecho al voto no puede quedar sin contenido, como quedaría si el margen de autoridad de la Asamblea Legislativa para ordenar y regular el ejercicio de la franquicia electoral fuese absoluto. Por tanto, en atención a la debida armonización de tales intereses contrapuestos, **el ámbito de protección preventiva debe quedar enmarcado por la probabilidad fundada de fraude**. (Énfasis provisto). *PSP, PPD, PIP v. Romero Barceló,* 110 DPR 248 (1980).

En cumplimiento con el mandato constitucional delegado a la Asamblea Legislativa para *legislar asuntos de materia electoral,* dicho Cuerpo aprobó la Ley Núm. 58-2020, conocida como el Código Electoral de Puerto Rico de 2020, (Código Electoral), 16 LPRA sec. 4501 *et seq.* Bajo dicho estatuto fue concebida la CEE, quien ha sido descrita como *guardián del interés público en los procesos electorales y principal albacea del valor del voto de cada ciudadano. Gautier Vega v. CEE,* supra.

Desde la *Exposición de Motivos* del Código Electoral se identifica al elector como el *eje y protagonista de nuestro sistema electoral, empoderado de su derecho al voto y con acceso fácil al*

*ejercicio de éste sin limitaciones ni condiciones procesales que, irrazonable-mente [lo] menoscaben, limiten o compliquen [...]". Íd.*

Respecto al tema preciso del voto adelantado, el Artículo 2.3(110) de la Ley Electoral precisa que el voto adelantado es un *método especial de Votación para garantizar el ejercicio del derecho al voto a los Electores elegibles, activos y domiciliados en Puerto Rico, cuando el día determinado para realizar una Votación confronten barreras o dificultades para asistir a su Centro de Votación.* Junto a este, el Artículo 2.3(47) cataloga a la Junta Administrativa de Voto Ausente y Adelantado (JAVAA) como el "[o]rganismo electoral de la Comisión con Balance Institucional que se crea con el propósito de administrar el proceso de solicitud, Votación y adjudicación de los Votos Ausentes y *Votos Adelantados*". *Íd.*

Por otra parte, surge del Artículo 3.2(3) de la ley bajo examen, la facultad de la CEE para aprobar las reglas y los reglamentos necesarios para implementar las disposiciones del Código Electoral. Además, en el Artículo 3.4 precisa la forma en que la CEE tomará las decisiones sobre asuntos de específica naturaleza electoral, a través de los Comisionados Electorales y del Presidente de la CEE.

En lo que respecta al voto adelantado, el Código Electoral regula esta modalidad de sufragio en sus Artículos 9.37 al 9.39. Además, el Artículo 14.3 del mismo estatuto facultó a la CEE a para *revisar y adoptar todas las reglas y los reglamentos electorales necesarios para implementar el Código Electoral.* De conformidad, la CEE aprobó el *Reglamento de Voto Adelantado Ausente y Voto Adelantado de Primarias 2024 y Elecciones Generales 2024.*

Finalmente, valga resaltar que, bajo el título *Obligación de la Rama Judicial,* en el Artículo 13.1(2)(a) y (b) del Código Electoral,

16 LPRA, sec. 4841, se dispuso lo que sigue sobre nuestra labor de revisión judicial ante determinaciones provenientes de la CEE:

> (a) En todo recurso legal, asunto, caso o controversia que se presente en un Tribunal de Justicia, **este deberá dar prioridad a la deferencia que debe demostrar a las decisiones tomadas por la Comisión a nivel administrativo, siendo esta la institución pública con mayor experti[s]e en asuntos electorales y la responsable legal de implementar los procesos que garanticen el derecho fundamental de los electores a ejercer su voto en asuntos de interés público.** (Énfasis y subrayado suplidos).

> (b) Ese derecho fundamental a votar del pueblo soberano en nuestro sistema democrático tiene supremacía sobre cualquier otro derecho o interés particular que pretenda impedirle votar. Ningún recurso legal, asunto, caso o controversia bajo la jurisdicción interna de la Comisión; y ningún proceso, orden, sentencia o decisión judicial podrán tener el efecto directo o indirecto de impedir, paralizar, interrumpir o posponer la realización de una votación según legislada y según el horario y día específicos dispuestos por ley; a menos que el Tribunal Supremo de Puerto Rico determine la violación de algún derecho civil que, con excepción de una Elección General, posponga la votación o la clasifique como inconstitucional.

A pesar de que lo anterior, lo cierto es que nuestro Tribunal Supremo también ha identificado circunstancias en que corresponde no observar tal deferencia. En específico, dicho alto Foro ha reconocido que la referida deferencia a las determinaciones administrativas cederá cuando: (1) la decisión no está basada en evidencia sustancial; (2) el organismo administrativo ha errado en la aplicación de la ley y, (3) ha mediado una actuación irrazonable o ilegal. *Acarón, et al v. D.R.N.A.*, 186 DPR 564 (2012); *Costa Azul v. Comisión, supra.* pág. 852. Sobre lo mismo, el alto foro ha manifestado que los tribunales no podemos imprimirle un sello de corrección, so pretexto de deferencia, a las determinaciones de una agencia administrativa o interpretaciones irrazonables, ilegales, o, simplemente, contrarias a derecho. *Graciani Rodríguez v. Garage Isla Verde, LLC,* pág. 127. Por lo que el criterio administrativo no podrá prevalecer cuando la interpretación estatutaria realizada por

una agencia provoque un resultado incompatible o contrario al propósito para el cual se aprobó la legislación y la política pública promueve. En este sentido, la deferencia judicial al *expertise* administrativo, concedido cuando las agencias interpretan la ley, tiene que ceder ante actuaciones que resulten irrazonables, ilegales o que conduzcan a la comisión de injusticia. *Oficina de Ética Gubernamental v. Martínez Giraud,* supra.

IV.

a.

En primer término, comienzo por resaltar, una vez más, que en la aprobación de las *Instrucciones* por la CEE intervino el voto unánime de los cinco Comisionado Electorales, el cual, según la propia comparecencia de la CEE ante el TPI reveló que se hizo con el propósito de buscar una *mayor pureza del proceso* en el voto adelantado. Me resulta significativo, además, que tal votación unánime de los Comisionados Electorales aconteciera en una fecha muy anterior a que sobreviniera el fragor intenso del conteo de votos en general. Es decir, tal aprobación unánime de las *Instrucciones* ocurrió en un momento en que los Comisionados Electorales contaban con la serenidad para establecer de manera consensuada mecanismos garantizadores de pulcritud o confianza en el ejercicio del voto por adelantado, libres de presiones aun sobre posibles *tendencias* en número de votos contados en general, que los llevara a variar posturas en último momento.

En cualquier caso, ateniéndome estrictamente a los principios de derecho administrativo que ya expuse, lo cierto es que a las *Instrucciones* le acompaña la presunción de regularidad y corrección de la cual gozan todas las determinaciones finales

administrativas[16]. *García v. Cruz Auto Corp.*, 173 DPR 870 (2008). Según nuestro máximo Foro ha puntualizado, **los tribunales debemos conceder gran peso y deferencia a las interpretaciones que los organismos administrativos realizan de las leyes y los reglamentos que administran**, por lo que **no podemos descartar libremente las conclusiones e interpretaciones de las agencias, sustituyendo el criterio de estas por el propio**. (Énfasis provisto). *Empresas Ferrer v. A.R.Pe.*, 172 DPR 254, 266 (2007). Así, **si la interpretación de la ley o reglamento que realiza determinada agencia administrativa es razonable, aunque no sea la única razonable, los tribunales debemos concederle deferencia**. *Íd*. Más aún, los tribunales podrán sustituir el criterio de la agencia por el suyo **únicamente cuando no encuentren una base racional para explicar la determinación administrativa.** *Íd.*

Me permito la siguiente digresión, a pesar de que lo expuesto en el párrafo que antecede constituye, a *grosso modo*, la pauta general de nuestra labor revisora sobre las determinaciones administrativas, **en el ámbito de la revisión de las determinaciones provenientes de la CEE en particular operan consideraciones adicionales o más específicas**. Así, por ejemplo, cabe distinguir que, mientras la Sección 4.5 de la Ley Núm. 38-2017, según enmendada, Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico, (LPAU), 3 LPRA sec. 9675, establece que "[l]as conclusiones de derecho serán revisables en todos sus aspectos por el tribunal", no hace alusión alguna a que

---

[16] Para efectos de la deferencia a las *Instrucciones* que debemos observar resulta del todo punto irrelevante que el Comisionado del PNP hubiese cambiado su postura a través de su comparecencia ante el TPI, luego de haber dado el voto para su aprobación unánime. Simplemente, el Artículo 3.4 del Código Electoral no contempla que un Comisionado Electoral tenga la potestad de enmendar una determinación tomada por la CEE a través de una moción al tribunal. Es decir, si algún Comisionado Electoral interesaba enmendar las *Instrucciones*, le correspondía atenerse al proceso que el artículo del Código Electoral aludido establece, y no fue aquí el caso.

**mostremos deferencia** por la interpretación que ofrezcan las agencias administrativas sobre sus leyes orgánicas o reglamentos. Sin embargo, mediante el Artículo 13.1(2)(a) de la Ley Electoral, **el Legislador nos convocó expresamente a dar prioridad a la** *deferencia que debe demostrar a las decisiones tomadas por la Comisión a nivel administrativo, siendo esta la institución pública con mayor experti[s]e en asuntos electorales y la responsable legal de implementar los procesos que garanticen el derecho fundamental de los electores a ejercer su voto en asuntos de interés público.* (Énfasis y subrayado provistos).

En consecuencia, juzgo que, aun sin renunciar a la labor interpretativa del Código Electoral, que siempre nos corresponde asumir como jueces, los foros revisores tenemos un llamado legislativo claro a no minimizar, eludir o despreciar las interpretaciones que sobre temas electorales provengan de la CEE.

A tenor, mostrar tal deferencia a las *Intrucciones* suponía en este caso, partir del entendido de que la agencia con el *expertise* sobre los asuntos electorales, la CEE, examinó la legislación atinente al proceso del voto adelantado, junto al Reglamento aprobado a los mismos fines, y concluyó que contaba con sustento legal para disponer sobre unas directrices que garantizaran la confiabilidad en dicho tipo de voto, estableciendo las medidas de validación allí contenidas. De lo que se sigue que la parte que propusiera alguna alternativa contraria a este entendido estaba llamada a demostrar que la CEE actuó *arbitraria, ilegalmente, o irrazonablemente en abuso de su discreción. Pérez López v. Dpto. Corrección y Rehabilitación,* 2022 TSPR 10.

Reconocido lo anterior, es entonces que podemos examinar si acontecen los supuestos en la revisión judicial que impulsen

superar la deferencia a la determinación administrativa y nos coloquen en posición de revocar o modificar.

El argumento esencial de los demandantes, aquí apelados, para solicitar que se ordenara el conteo de sus votos, **prescindiendo del proceso de validación establecido en las Instrucciones,** es que, presuntamente, la CEE no contaba con sustento legal para establecerlo. No tiene razón.

Le lectura del Art. 9.38 del Código Electoral en general, y de su inciso (8) en particular, revela una clara delegación por el Poder Legislativo a la CEE para instrumentalizar los requisitos relativos a la solicitud de voto adelantado. En el inciso octavo aludido se establece con precisión la obligación del elector en proveer, entre otros, la dirección completa de su domicilio en Puerto Rico, la dirección postal completa del lugar donde recibiría por correo sus papeletas de votación, si ese fuese el método que seleccionó para su voto ausente, número telefónico con código de área, de celular, correo electrónico, entre otros[17]. A renglón seguido del inciso (8)(h) el Legislador dejó plasmado que *la Comisión (CEE) determinará si el elector deberá proveer contestaciones a preguntas de seguridad u otros elementos que considere necesarios para la corroboración de la identidad del elector*. (Énfasis provisto).

Por lo anterior, y sometiéndome al criterio de razonabilidad que requiere el examen de los dictámenes administrativos que se impugnan, juzgo completamente razonable el mecanismo sobre corroboración de identidad establecido en las *Instrucciones,* a partir de la lectura las porciones del Código Electoral aludidas. Cabe insertar aquí la expresión del Juez Asociado Estrella Martínez al advertir que, *hay una delegación expresa por parte de la*

---

[17] Esta autorización a la CEE para requerir información al elector plasmada en el Art. 9.38(8) del Código Electoral, no se debe confundir con la prohibición que surge del mismo artículo, pero en su inciso (2), al advertir que cuando el elector presenta su solicitud de voto adelantado, no se le podrá interrogar ni requerir documentos.

*Asamblea Legislativa a favor de la CEE para que ésta reglamente **y abunde en el procedimiento para ejercer un voto adelantado.*** (Énfasis provisto). Ver, *Opinión de conformidad* del referido juez, en *Gautier Vega v. CEE,* supra. Lo que además resulta cónsono con el muy bien establecido entendido de que *corresponde a la Asamblea Legislativa prescribir una norma de carácter general **y que esta sea complementada por la intervención de la agencia administrativa, que, con su expertise, <u>detalla la legislación aprobada</u>.*** (Énfasis y subrayado provistos). *R&B Power Inc. v. Junt. de Subastas Adm. Servs. Gens.,* 2024 TSPR 24.

Con todo, los demandantes esgrimieron que tal acto de verificación de identificación solo operaba en el proceso de *solicitud del voto adelantado,* mas no una vez fuera emitidas las papeletas de votación a dichos electores, en tanto cabría considerarles como aprobados por la CEE y solo sujetos al método de verificación descrito en el Art. 9.39(3). Bajo la misma lógica, afirman que, una vez es emitido el voto, por virtud de lo que dispone el Art. 9.39(3) del Código Electoral, solo le era lícito a la CEE requerir como método de validación, la copia de la tarjeta de identificación o cualquier otra identificación con foto vigente. Es decir, los apelados proponen una fractura o falta de continuidad entre el Art. 9.38 y el 9.39 del Código Electoral, sin posibilidad de comunicación o relación entre uno y el otro.

Sobre lo anterior, identifico una pretensión por los apelados de sustituir el *expertise* de la CEE en materia eleccionaria, por el criterio de ellos en referencia a dicha legislación especial. Reitero que el principio general de derecho a tener en consideración ante una controversia tal es el de que, *si la interpretación de la ley o reglamento que realiza determinada agencia administrativa es razonable, **aunque no sea la única razonable**, los tribunales debemos concederle deferencia.* (Énfasis provisto). *Empresas Ferrer*

*v. A.R.Pe.*, supra. De lo que se deriva que, en cuanto juzguemos razonable la interpretación que realizó la CEE del conjunto de los Arts. 9.38 y 9.39, ahí mismo cabría detener nuestra labor revisora, aunque nos pareciere que hubiese otras posibles interpretaciones también razonables.

Es de notar que, también en el contexto de una controversia sobre el voto adelantado y la capacidad de la CEE para reglamentarlo, hace apenas unos años el Juez Asociado Martínez Torres llamó nuestra atención a que *hiciéramos una **lectura integrada** del Código Electoral y **no una lectura aislada, carente de contexto**, del Art. 9.39(3)*. (Énfasis provisto). Ver, *Opinión de conformidad* emitida por el Juez Asociado Martínez Torres en *Gautier Vega v. CEE*, supra. Una *lectura integrada* es precisamente la que permite observar una continuidad de las salvaguardas previstas en el Art. 9.38 del Código Electoral para el voto adelantado, hasta el mismo momento del voto, según concebido en el 9.39 del mismo estatuto. De aquí la previsión que procede atribuirle a la inclusión del inciso 2do de las *Instrucciones*, a efectos de remitir las papeletas de voto a los electores de voto adelantado **que todavía estaban *pendientes de validar***, pero manteniéndoles en dicho estatus (pendiente de validar), hasta que se lograra obtener la validación pendiente. En este sentido, no es correcta la teoría legal que promueven los apelados de que el mero envío de las papeletas a los electores suponía su aprobación como electores adelantados, en tanto mantuvieran el estatus de *pendiente de validar*. La previsión mostrada por la CEE en las *Instrucciones*, ante la posible inclusión de votos adelantados sin verificar identidades, resulta cónsona con la responsabilidad que le fue delegada para mantener la confianza ciudadana en los procesos que dirige.

Por otra parte, **acoger la teoría de los apelados, según lo hizo el TPI, supondría cerrar toda vía de verificación de información sobre los electores por voto adelantado, una vez se le remitan las papeletas, a pesar de que en el transcurso del proceso surgiera el más concreto de los señalamientos sobre posible fraude. Esto me resulta absurdo, francamente no juzgo dable siquiera sugerir que la CEE se deba quedar cruzada de brazos ante un posible fraude, por el solo hecho de haber remitido las papeletas a los electores de voto adelantado, a pesar de tener pendientes procesos de validación**.

Por otra parte, tampoco juzgo una carga onerosa al elector que pueda frustrar el valor del voto emitido, el proceso de revisión de validación descrito en las *Instrucciones*, esto partiendo del entendido de que los votos emitidos serán contados, una vez se cumpla con el proceso de validación. Observo ausencia de onerosidad en el proceso establecido en las *Instrucciones* para verificar las identidades, -al referirme a la instrucción dirigida a la JAVAA de que habría de comunicarse con los electores para dicho propósito-, pues a través del Art. 9.38(8) del Código Electoral el Legislador dispuso que, para ser un elector elegible para el voto adelantado, este tendría que proveer, entre otros, número telefónico o de celular, además de correo electrónico. Resulta coherente pensar entonces, que a través del requerimiento de dicha información el Legislador previó que la CEE tuviera que utilizar tales medios de comunicación para corroborar la identidad del elector, según quedó plasmado en las *Instrucciones*. Tal proceso de múltiples llamadas al elector cumple el propósito, además, de darle la oportunidad de proveer la información pertinente, y notificarle de cualquier acción de la CEE antes de tomar una decisión final.

Al completarse el proceso de validación previsto en las Instrucciones se proveería garantías sobre la pureza del trámite

electoral, salvaguardando el proceso contra posibles fraudes. Sobre lo mismo, me resulta extensible al caso ante nuestra consideración la expresión del Tribunal Supremo en *Gautier Vega v. Joaquín Sánchez*, supra, al identificar que el interés del estado en la exigencia del domicilio electoral se basa *en el deber de prevenir el fraude y la votación múltiple.*

En definitiva, las *Instrucciones* se ajustaron a derecho, en tanto su aprobación obedeció a un ejercicio razonable de interpretación del Código Electoral por el órgano facultado y especializado en ello, la CEE. En consonancia, dicho ejercicio legítimo de la facultad administrativa de la CEE merecía la deferencia del Tribunal.

En San Juan, Puerto Rico, a 11 de diciembre de 2024.


Nery Enoc Adames Soto
Juez de Apelaciones